PIERRE CHOUTEAU, Appellant, v. THE ST. LOUIS GAS-LIGHT COMPANY, Respondent.

St. Louis Court of Appeals, December 22, 1891.

Illuminating Gas : DELIVERY : LIABILITY OF CONSUMER.  A gas company, which supplies illuminating gas to the consumer's premises, delivers the gas when it passes through its service-pipe supplying those premises, and the meter which registers the delivery, and it is accordingly entitled to charge the customer for the amount thus delivered and registered, assuming that the meter is not defective so as to register an excessive amount. If, without its connivance or fault, the gas is subsequently diverted from the premises where it is thus delivered, so that a third person in fact obtains the use thereof, the gas company is not answerable to the consumer for the loss.

*Appeal from the St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

*Valle Reyburn*, for appellant.

*G. A. Finkelnburg*, for respondent.

THOMPSON, J.—This action is brought to recover certain moneys, alleged to have been paid by the plaintiff to the defendant as gas bills through mistake, and wrongfully collected from the plaintiff by the defendant. The petition sets up that the defendant is a

corporation engaged in furnishing illuminating gas to customers in the city of St. Louis; that amongst its customers to whom it furnished gas from the year 1885 to the year 1889, inclusive, was plaintiff, who obtained gas from defendant for illuminating the Olympic theater; that from, to-wit, the twenty-ninth day of August, 1885, to the first day of January, 1890, the plaintiff was presented by defendant with a series of bills for gas, alleged to have been furnished by defendant and consumed in lighting said theater; that the quantity of gas consumed is estimated and measured by meters, being machines for measuring the consumption of gas belonging to defendant and placed in the buildings wherein such gas is consumed; that defendant presented to the plaintiff, during and between the dates aforesaid, a series of bills, aggregating a very large sum of money, which plaintiff duly paid to the defendant; that the defendant, wrongfully and without the knowledge of this plaintiff, embraced in said bills the quantity of gas indicated by a meter placed on plaintiff's premises, but through which the gas supplied to the plaintiff did not pass, but which measured the supply of gas consumed by another and different customer than the plaintiff; that thereby the plaintiff paid this defendant the following amounts, at the dates hereinafter stated, for gas charged between said dates, for which the plaintiff was not liable to this defendant, and for which the plaintiff received no consideration from the defendant, and which in equity and good conscience defendant is obligated to return unto plaintiff (setting out certain sums with the dates of payment), being in all the sum of eleven hundred and twenty-four dollars and thirty cents ($1,124.30), by mistake paid by the plaintiff to the defendant, and wrongfully collected by the defendant from the plaintiff. Plaintiff avers that, upon learning the facts herein stated, to-wit, in December, 1889, he informed the defendant and made demand for said amount, which

the defendant refused and still refuses to pay the plaintiff. The answer, so far as it raised an issue which remains in the case, was a general denial. There was a stipulation admitting the correctness of the amount of the payments claimed to be recovered back, but not admitting the right of recovery.

The case was tried before the court sitting as a jury and the evidence disclosed substantially the following state of facts : The Olympic theater building, situated on the west side of Broadway between Walnut and Elm streets in the city of St. Louis, was erected in 1882 by C. A. Spaulding, as owner and proprietor. It was so constructed as to have five floors fronting on Broadway, while the theater proper occupied the rear or western portion of the building. The first floor on Broadway was fitted up for stores ; the second-floor rooms, fronting on Broadway, were reserved by Mr. Spaulding for various purposes in connection with his theater ; the third, fourth and fifth floors were leased to Mr. Miller, proprietor of the St. James Hotel, which adjoined the theater building on the north ; and these upper floors were connected by doors and passages with the hotel. When the building was ready for occupancy in the year 1882, Mr. Spaulding applied to the defendant for four gas meters to be placed in the basement of the building: Two for the theater proper, one for the second floor, and one for the third, fourth and fifth floors. Defendant was requested to collect for gas passing through this latter meter from the proprietor of the St. James Hotel, which was done. There were four separate bills made out for this building on each pay day, one for each meter, three in the name of the Olympic theater, and one in the name of Mr. Miller. This was and remained the situation from 1882, when the building was completed, up to September, 1885, when Mr. Spaulding concluded to give up the rooms on the second floor, hitherto used in connection with the theater ; and in that month he leased these rooms also to Mr. Miller of the St. James

Hotel, so that Mr. Miller now occupied all the upper floors from the second to the fifth, both inclusive. No notice of this change of occupancy was given to defendant, and defendant was not requested to make any change either in the meters, connections or accounts ; the defendant continued to present its three bills in the name of the Olympic theater as theretofore, and Mr. Short, the manager and treasurer of the theater, went on paying these bills, thus accruing on these three meters, just as he had done before ; while Mr. Miller paid the bills accruing on the fourth or "hotel meter," just as he had done before. So it seems that Mr. Spaulding, the landlord, was now paying his tenant's gas bills for the gas consumed on the second floor, and which passed through one of the three meters known as "theater meters." The number of this second floor meter was originally 59,452, but in October, 1888, a new meter had to be substituted ; this new meter was number 173,170 and simply took the place of the old one and performed the same function—that is, it registered the gas consumed on the second floor of this building. The upper floor or "hotel meter" as it was sometimes called, which registered the gas consumed on the third, fourth and fifth floors, was numbered 40,216. The numbers of the other two "theater meters" are immaterial.

This new state of affairs continued up to about October or November, 1888, when a fraud was perpetrated by some one in the building,—the testimony does not disclose by whom. It appears that meter number 40,216 ( the upper floor meter ), was disconnected from the pipe leading to the third, fourth and fifth floors and meter number 173,170 (the second floor meter) was made to connect with those upper floors. The result was that the gas consumed on all the upper floors was drawn through the meter heretofore known as the second-floor meter (number 173,170).

It appears that changes may be made, and are constantly being made, in the arrangement and connection

of gas pipes in the interior of buildings without notifying the gas company. So long as the service-pipes are not interfered with, the gas company exercises no supervision. The service-pipes lead from the street main into the building and connect with the meters. Beyond that point the gas company assumes no control. The men, who come from time to time to take the registration of meters, merely determine how much gas has passed through a meter, but do not concern themselves about the connections beyond the meter, or where the gas is led to and actually consumed. This is under the control of the owner or occupant of the building, who may arrange it to suit himself, employing private gas fitters for that purpose. But when the meter man finds a meter wholly disconnected from the interior house pipes and serving no further use on the premises, he reports it at headquarters, and the meter is ordered in, or "returned," as they call it.

When the meter man called around in October, 1888, he found meter number 40,216 detached from the "riser," which is the pipe leading up into the building, and the gas was shut off from the meter at the inlet; in short he found it abandoned, which fact he reported at the office of the defendant, and, in accordance with the rules of the company, the abandoned meter was ordered " returned," whereupon an employe took it away and brought it back to the defendant's storehouse. Mr. Short went on paying the bills on the three remaining meters just as he had done before, including number 173,170, which now supplied all the upper floors.

In order to understand what followed, it is necessary to explain the connection of the plaintiff, Mr. Pierre Chouteau, Jr., with this controversy. It appears that Mr. Chouteau, as proprietor of the Grand Opera House, had a joint business arrangement with Mr. Spaulding, of the Olympic theater, under the terms of which Mr. Chouteau agreed, among other things, to furnish the necessary light to both theaters; this arrangement

began with the theatrical season of 1886-87, and was to
continue for five years. No notice of this arrangement
was given to the defendant, and, so far as the record
shows, it was a private agreement between these gentle-
men, unknown to outsiders. Under this arrangement
the gas bills of the Olympic theater, paid by Mr. Short
to defendant, were regularly charged to Mr. Chouteau
in the accounts growing out of the joint business of the
two theaters. After awhile, Mr. Chouteau began to com-
plain to Mr. Short about the size of these bills, and, after
repeated protestations on his part, the Olympic people
finally in 1889 concluded to make an investigation, for
which purpose the various meters and their connections
were tested by experts, when the state of facts above
set forth was discovered. Notice was then given to the
defendant by the Olympic theater that it would no
longer pay the bills on meter number 173,170, but that
the defendant must look to Mr. Miller for gas consumed
through that meter. This was done in December, 1889.
The defendant promptly notified Mr. Miller, who there-
upon made an application in his own name for meter
number 173,170, and it was transferred upon the books
of the defendant company from the account of the
Olympic theater, where it stood since 1882, to the
account of Mr. Miller, who has since paid the bills
thereon.

Plaintiff Chouteau now sues the defendant for a
return of the money paid by the Olympic theater for gas
consumed by Mr. Miller in the Olympic theater build-
ing since the year 1885, all of which gas passed
through meter number 173,170, and its predecessor
number 59,452.

At the trial of this case a jury was waived, and the
issues of fact were decided by the court, under certain
declarations of law, as follows:

The court gave the following instruction asked by
defendant: "If the court, sitting as a jury, finds from the
evidence that, during the period here in controversy, the

plaintiff was neither owner, tenant nor occupant of the Olympic theater building, or any part thereof, but was under a contract with the owner thereof to pay the expense of lighting certain portions of said building, of which fact the defendant was not informed and had no knowledge ; and if the court further finds that a number of gas meters were placed in the cellar of said building in the year 1882, by which meters different parts of said building were supplied with gas in manner and as at the time directed by the owner of said building ; that afterwards, during the month of September, 1885, a part of said building, which was up to that time occupied by the owner, was let to a tenant, of which fact no notice was given to the defendant, and that no change of meters was applied for by the plaintiff, or the persons in charge of the building, when said change of occupancy took place ; and that thereafter the persons in charge of the theater building continued to pay the weekly bills for gas supplied to this part of the building, and in all respects as they had theretofore done, until December, 1889, when notice was given by the persons in charge of the building that they would no longer be responsible for this part of the gas supplied, then defendant is not liable in this action to repay any money received by it for gas actually sold and delivered by it through the meter which supplied the portion of the building here in controversy, although plaintiff in this case and the persons in charge of the building have been ignorant or forgetful of the fact, that the gas supplied to this portion of the building was consumed by a third party."

The court also gave the following instruction of its own motion : " The court declares the law to be that if, at the times mentioned, several gas meters of defendant were in the basement of the Olympic theater building in the city of St. Louis ; and if one of said meters measured the quantity of gas supplied by the defendant, consumed in and upon the second floor of said theater

building, in and upon third, fourth and fifth floors of said theater building; and if at said times said second floor and said third, fourth and fifth floors were leased or rented to the proprietor of the St. James hotel and were used as parts of said hotel; and if the bills based on the register of said meter for said gas so consumed were made out against, and in the name of, the Olympic theater and were presented to the plaintiff's agent, Short, at said theater, and were paid the defendant by said Short from funds of the plaintiff, or were debited by Short against the plaintiff and credit taken therefor by Short in settlement by him of amounts of money of plaintiff collected by Short; and if, in paying said bills, Short acted under the mistake, and in the belief that the same were for gas consumed for the purpose of said theater; and if said Short and plaintiff and defendant, at the times said bills were presented and payment made, believed that the gas so charged and paid for was consumed in and for said theater, and not in or upon and for those portions of the theater building used and tenanted by the hotel proprietor, then the plaintiff is entitled to recover from the defendant in this action the amount of said bills; unless the court shall also find and believe from the evidence that the money sought to be recovered was paid for gas actually delivered by said defendant through meters placed in said theater building at the request of the owners or lessees of said theater; and that said meters, as originally connected with the internal gas pipes arranged for the lighting of said building, and the different parts thereof, were used to measure the gas actually consumed by the occupants of said theater building in connection with the theater proper, as distinguished from the upper part of said building, which was leased from the beginning and occupied as part of the St. James hotel; that such internal arrangement and occupancy was thereafter changed without any notice of said change being given to, or acquired by, said defendant; and that the defendant

continued to supply gas through said meters in the same manner as before such change of occupancy took place in September, 1885, and received payment therefor, as before, from the persons in charge of said theater building, as supposed in the instruction marked 'given in behalf of the defendant.' "

The only instruction asked by the plaintiff, and refused, was an instruction to the effect that, under the evidence, the court ought to give judgment for the plaintiff. The court gave judgment for the defendant, and the plaintiff prosecutes this appeal.

The question for judgment arises upon a substantially conceded state of facts, and the court gave the only judgment which could properly have been given. If there is any room for different inferences from these facts, the instructions show that the court has properly applied the law to any inferences which could properly be drawn from them. This case, stripped of its long details, is very simple. The proprietor of the Olympic theater procured the defendant to put some of its meters into its building to supply gas, manufactured and sold by the defendant, to the tenants of such property. By that agreement the proprietor of the theater impliedly, if not expressly, engaged to pay, at an agreed rate for all the gas which should pass through those meters, as shown by their registration. The gas, for which the payments were made, which are now sought to be recovered, did pass through two of those meters, and that puts an end to the question.

The whole case turns upon a consideration of the question, what is a *delivery* of the goods, where the goods consist of illuminating gas, furnished by the seller to the consumer, for daily consumption on his premises, and passed from the seller's service-pipe through its meter to the consumer's distribution pipe. Upon this evidence there can be but one answer to this question, and that is, that the delivery takes place when the gas passes through the meter,—assuming of

course, that it is not defective, so as to register an excessive amount. When the gas passes through the company's meter into the consumer's pipes, the goods passed from the hands of the vendor into those of the vendee. With the question, what becomes of the goods after that, the vendor has nothing to do. If, without the fault or connivance of the vendor, they are afterwards put out of the hands of the vendee into those of a third person, so that the vendee does not actually get the benefit of them, that is a matter with which the vendor has nothing to do. He performs the contract, and becomes entitled to the purchase price, when he delivers the goods into the hands of the vendee.

The evidence in this case discloses that the distribution pipes of the customer, after the gas passes through the defendant's meters, are not under the defendant's control ; but that they are under the control of the customer, being his own gas fixtures on his own premises. All that there is in this case, then, is that a great quantity of illuminating gas, purchased of the defendant by the party under whom the plaintiff claims, and actually delivered by the defendant to him, has been, after delivery, fraudulently diverted to the use of some one else.

This action is brought, and the case is argued in behalf of the plaintiff, on the theory of the right to recover money paid under a *mistake.* But the money was not paid under a mistake. If the money had not been paid, the defendant could sue for it and recover under the state of facts here shown in evidence ; because it was what the proprietor of the Olympic theater agreed to pay for, and what the defendant delivered. The mistake consists in bringing the action against the wrong defendant. If this defendant had been in any way guilty of connivance in the wrong, by which the gas was diverted from the plaintiff, or if it had failed in any duty owing to the plaintiff by which the wrong

would have been prevented, the case would stand on a different footing.

It is argued that the plaintiff is entitled to recover at least the amount of the three last items, shown by the defendant's testimony to have accrued *after* the defendant had removed the meter number 40,216, and substituted in its place meter number 173,170. This argument can be supported only upon the theory that the defendant, by this substitution of meters, caused the diversion of the gas from plaintiff's premises to that of Miller. This calls, in the most favorable view for the plaintiff, for the decision of a question of fact, and this question of fact the trial court, sitting as a jury, has resolved against the plaintiff. It cannot be even plausibly argued, upon this record, that the court was obliged to decide it the other way.

The judgment will be affirmed. All the judges concur.